**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

| | |
|---|---|
| JOSEPH M. STILL BURN CENTERS, INC., | |
| Plaintiff, | |
| v. | Civil Action No.: _____ |
| DEREK M. CULNAN, M.D.; MISSISSIPPI BURN, HAND, AND RECONSTRUCTION CENTERS PC; and MAGNOLIA MEDICAL MANAGEMENT LLC, | |
| Defendants. | |

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW

NOW COMES Plaintiff, Joseph M. Still Burn Centers, Inc. ("JMS"), by and through its attorneys, and hereby moves for a Temporary Restraining Order ("TRO") and preliminary injunction pursuant to Fed. R. Civ. P. 65 against Defendants Derek M. Culnan, M.D. ("Culnan"), Mississippi Burn, Hand, and Reconstruction Centers ("Mississippi Burn"), and Magnolia Medical Management LLC ("MMM"). For the reasons explained herein, JMS will suffer immediate and irreparable injury unless Defendants are enjoined from continued violations of the restrictive covenant agreements contained in the employment agreement between JMS and Culnan.

## I.    NATURE OF THE MOTION AND BACKGROUND FACTS

This case involves the calculated acts of one of JMS's former physician employees to leverage the loss of JMS's relationship with its affiliate hospital in Jackson, Mississippi to create a surgical specialty practice for himself and to misappropriate JMS's confidential information and employee relationships in violation of his restrictive covenant agreements.

JMS is a medical-surgical practice principally located in Augusta, Georgia and primarily specializing in the care and treatment of burn injuries and wounds. (Declaration of Dr. Hassan "Hassan Dec." ¶¶ 2 and 4). S.M. Abu Zaheed Hassan, M.D. ("Dr. Hassan") is the CEO and sole shareholder of JMS. (*Id.* at ¶ 2). In addition to its operations in Augusta, JMS has locations in Atlanta, Georgia; Hahira, Georgia; Charleston, South Carolina; and Jackson, Mississippi. (*Id.* at ¶ 3).

JMS is the largest burn surgery specialty practice in the United States and the third largest burn specialty practice in the world. (Hassan Dec. ¶ 4). JMS physicians routinely treat patients from across the United States and throughout the world. (*Id.*). Additionally, JMS physicians travel to its various practice locations from time to time to assist in providing coverage when a physician based in that location is out of the office. (Hassan Dec. ¶ 5). To that end, JMS physicians routinely maintain licensure in multiple states and privileges at multiple hospitals affiliated with JMS. (*Id.*). JMS physicians and midlevel providers (*e.g.*, nurse practitioners and physician's assistants, also known as advanced practice providers or "APPs") receive training periodically, at JMS's expense, at JMS's primary location in Augusta, Georgia. (Hassan Dec. ¶ 6).

Defendant Derek M. Culnan, M.D. ("Dr. Culnan") was hired by JMS as a physician provider on November 14, 2016, and he was last employed by JMS at its Jackson Mississippi location ("JMS Mississippi"). (Hassan Dec. ¶ 7). Dr. Culnan entered into his most recent employment agreement with JMS with an effective date of January 1, 2022. (Hassan Dec. at ¶ 8 and Exhibit 1 to Pl.'s Compl. (the "Culnan Employment Agreement").[1] In the Employment Agreement, Dr. Culnan agreed, among other things, that both during the course of his employment with JMS and after his employment ended, he would protect and not misuse JMS's confidential

---

[1] Because the Culnan Employment Agreement contains confidential business information, certain portions of the Agreement have been redacted to protect JMS's confidential business information. If necessary, an unredacted version of the Agreement can be filed under seal or made available for the Court's in camera review.

information. (Culnan Employment Agreement ¶ 16). The clauses from Dr. Culnan's Employment

Agreement concerning use of confidential information are reproduced below:

16.  **Confidentiality.**

(a)    Employee recognizes the interest of the Company and its affiliates in maintaining the confidential nature of its Confidential Information (as defined below). Accordingly, Employee covenants and agrees that Employee will not, at any time, other than strictly in the performance of Employee's duties for the Company or any affiliates, both during and after Employee's employment with the Company, communicate or disclose to any person or entity, or use for Employee's benefit, or for the benefit of any other person or entity, either directly or indirectly, any Confidential Information.  Employee hereby represents and warrants that Employee has a paramount duty and responsibility to maintain and safeguard all Company property issued and/or provided to Employee, which includes all Confidential Information in any medium.  Except to the extent necessary to perform the duties assigned to him by the Company and to fulfill his obligations to patients, the Employee will hold such Confidential Information in trust and strictest confidence, and will not use, reproduce, distribute, disclose, or otherwise disseminate the Confidential Information or any physical embodiments thereof and may in no event take any action causing or fail to take the action necessary in order to prevent, any Confidential Information disclosed to or developed by the Employee to lose its character or cease to qualify as Confidential Information.  Employee acknowledges that all documents, knowledge, and information regarding the methods of operation of the Company are highly confidential and constitute trade secrets, including but not limited to: information regarding patient lists, patient solicitation, patient treatment and charging, billing practices and procedures, business techniques and methods, strategic plans, financial statements and reports, operating manuals, leases, employment agreements, and any and all reports, memoranda or correspondence and related data regarding the Company's methods of operation,  symbols, trademarks, service marks, designs, management information systems, utilization procedures and protocols, forms and claims processing techniques, utilization review and quality assurance mechanisms and data, agreements with managed care organizations and purchasers of services, educational programs related to Company activities, any information related to Company's financial affairs, business and marketing plans and strategies, contract negotiations with managed care organizations, Company fee schedules, and any other information that Company considers to be a trade secret or confidential information (all of the foregoing collectively referred to herein as "Confidential Information").

(b)     Employee agrees and covenants not to disclose or communicate, directly or indirectly, to any person or use on behalf of or incorporate into the systems of any person any

Confidential Information of the Company; provided, however, Employee may disclose Confidential Information (i) to his attorneys or accountants, provided they have agreed not to disclose such information to any third party without the written consent of the Company, and (ii) pursuant to the order of a court of competent jurisdiction.   Employee further agrees not to misuse any Confidential Information to the detriment of the Company.   Immediately after the termination of his employment or the cessation of his providing services under this Agreement, Employee shall return any and all Confidential Information, including all copies thereof, in his possession to the Company.   The provisions of this Section 16 will survive termination of Employee's employment or termination of this Agreement for any reason and continue for so long as any information becomes publicly available through no direct or indirect fault or act of Employee, or otherwise no longer qualifies as a trade secret.   Pursuant to the Defense of Trade Secrets Act, Employee shall not be held criminally or civilly liable under any federal or state law for the disclosure of a trade secret that: (i) is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.   If Employee files a lawsuit for retaliation for reporting a suspected violation of law, Employee may disclose the trade secret to the attorney of Employee and use the trade secret information in the court proceeding if Employee files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to a court order.

(c)     Employee acknowledges that this Agreement is confidential and shall not disclose the terms of this Agreement to any third party except as may be necessary to obtain advice and counseling from his attorneys and financial advisors or as otherwise may be required through legal process.

(Culnan Employment Agreement ¶ 16).

Dr. Culnan also agreed that both during the term of his employment with JMS and following termination of his employment he would not "for himself or as an employee, independent contractor or agent for any person or entity, directly or indirectly solicit or attempt to solicit any patients treated by [him] within the last twelve (12) months prior to the effective date of termination, for a period of two (2) years from and after the effective date of termination of the

[the Employment Agreement]. (Culnan Employment Agreement ¶ 27(b)). The customer/patient non-solicitation clauses from Dr. Culnan's Employment Agreement are reproduced in full below:

> (b)    During the term of this Agreement and upon termination of this Agreement for any reason, whether by the Company or Employee, Employee covenants and agrees that, without the prior written consent of the Company, Employee will not, either for himself or as an employee, independent contractor or agent for any other person or entity, directly or indirectly solicit or attempt to solicit any patients treated by Employee within the last twelve (12) months prior to the effective date of termination, for a period of two (2) years from and after the effective date of termination of this Agreement.

(Culnan Employment Agreement ¶ 27(b).)

Additionally, Dr. Culnan agreed that both during his employment with JMS, and for a period of two years after his employment with JMS terminated, he would not for himself or "for any other person or entity, directly or indirectly solicit or attempt to hire away" JMS's employees. (Culnan Employment Agreement ¶ 27(c)). The employee non-solicitation clauses from Dr. Culnan's Employment Agreement are reproduced below:

> (c)    During the term of this Agreement and upon termination of this Agreement for any reason, whether by the Company or Employee, Employee covenants and agrees that, without the prior written consent of Company, Employee will not, either for himself or as an employee, independent contractor or agent for any other person or entity, directly or indirectly solicit or attempt to hire away any persons then employed or retained by the Company, for a period of two (2) years from and after the effective date of termination of this Agreement.

(Culnan Employment Agreement ¶ 27(c)).

Dr. Culnan agreed that any violation of these restrictive covenants in his Employment Agreement would cause "irreparable injury" to JMS, and that JMS would be entitled to a "temporary or permanent restraining order or injunction" to enforce its rights under the Employment Agreement. (Culnan Employment Agreement ¶ 28). He also agreed that JMS would

be entitled to such injunctive relief "without the necessity of posting bond therefor." (Culnan Employment Agreement ¶ 28).

JMS has had continuous operations in Jackson, Mississippi for over fifteen years, and has primarily been affiliated with Merit Health Central ("Merit") hospital in Jackson, which maintained a burn center. (Hassan Dec. ¶ 9). For the last three years, JMS has averaged between $5.2 million and $6.2 million in gross revenue from its operations in Jackson. (Hassan Dec. ¶ 10). JMS also has spent extensive time and resources to develop and train its midlevel providers in the specialized nature of its practice at JMS Mississippi, as well as to develop its own evidence-based burn protocols and treatment procedures. (Hassan Dec. ¶ 11). Further, JMS – through fees paid to its management services organization – has spent extensive time and resources to develop its patient base through various marketing efforts. (Hassan Dec. ¶ 12). In each of the last three years, the fees JMS has paid towards marketing expenses to grow its practice in Mississippi have totaled between approximately $75,000 and $95,000.  (Hassan Dec. ¶ 12).

In September 2022, Merit notified JMS that, through no fault of JMS, it had decided to close its burn center. (Hassan Dec. ¶ 13). JMS began looking for a new affiliate hospital in or around Jackson, Mississippi to continue its Mississippi operations. (Hassan Dec. ¶ 13). To that end, JMS entered into non-disclosure agreements ("NDA") with other hospitals and/or hospital systems in Mississippi to discuss potential partnerships, including an undisclosed/confidential entity known for the purposes of this civil action as "Hospital."[2] (Hassan Dec. ¶ 15). During the term of his employment with JMS, Dr. Culnan obtained credentials at Hospital and treated JMS patients at Hospital. (Hassan Dec. ¶ 16).

Upon information and belief, at some point following Merit's termination of its agreement with JMS, Dr. Culnan formed the intent to leave JMS and form his own competing medical practice

---

[2] Because of the ongoing negotiations with Hospital and the existence of the NDA, Plaintiff has not listed Hospital's actual name – however, Plaintiff will provide additional information regarding Hospital to the Court for in camera review, if requested by the Court.

*while he was still a JMS employee*. Further, upon information and belief, while still a JMS employee, Dr. Culnan met with executives at Hospital and with members of the Mississippi state government – to include the governor of Mississippi – to discuss funding a burn center at Hospital. (Hassan Dec. ¶ 17). Upon information and belief, this included Dr. Culnan providing Hospital with a "shopping list" of several million dollars' worth of equipment that he said would be needed to form a new burn center. (Hassan Dec. ¶ 17). Dr. Culnan did not provide information about these meetings to JMS, and, upon information and belief, engaged in these meetings for the purposes of misappropriating JMS's corporate opportunities for himself and his new practice. (Hassan Dec. ¶ 17).

JMS first became aware of Dr. Culnan's efforts to potentially misappropriate JMS's corporate opportunities and to recruit JMS's employees in October 2022. (Hassan Dec. ¶ 18). JMS's leadership team was notified by an employee that Dr. Culnan had asked nurse practitioner Kelley Farner, another JMS Mississippi employee, to solicit salary information from the midlevel providers at JMS Mississippi.  Between 6:05 and 6:06 PM on October 10, 2022, Ms. Farner, using a company provided e-mail account, sent an e-mail to the other JMS Mississippi midlevel providers. (Hassan Dec. ¶ 19; Declaration of Dallas Smith "Smith Dec." ¶ 5(a)). In that e-mail, Ms. Farner wrote that

> [d]uring negotiations with [Hospital], Dr. Culnan is exploring the possibility of our collective [*sic*] separating from JMS, and either we would become [Hospital] employees, or he would create his own separate corporation, to which we would be employed. To make the best decision for all of us, he needs to know each provider's salary. I agreed to collect this information for him. If you could, please send me your current salary, it would be greatly appreciated. I still feel very confident that Dr. Culnan will take us all in the right direction for our future.

(Smith Dec. Ex. A).

At least one employee, Allison Taylor, responded with her salary information. (Hassan Dec. ¶ 19; Smith Dec. Ex. B). At approximately 8:40 PM the same night Ms. Farner sent out a text apologizing for sending this e-mail over her JMS Mississippi-provided e-mail account, stating that

JMS company email could be monitored, and noting that her sending the email on JMS's mail server could have "serious ramifications." (Hassan Dec. ¶ 19; Hassan Dec. Ex. A). Ms. Farner directed the recipients of the text not to discuss the e-mails with anyone and she apologized for "any harm that may come from my error." (Hassan Dec. Ex. A). Ms. Farner also deleted these e-mails from her company e-mail account in an attempt to cover up what she had done; however, the e-mails were recovered by JMS's information technology provider. (Smith Dec. ¶ 5(b)).

In October 2022, following Merit's termination of its partnership with JMS, Dr. Culnan and Abelardo Medina, M.D., Ph.D. ("Dr. Medina"), JMS Mississippi's other physician provider, visited a medical office building in Jackson to find a new location for JMS Mississippi's operations. (Declaration of Abelardo Medina, M.D., Ph.D, "Medina Dec." ¶ 8).  During that visit, Dr. Culnan told Dr. Medina that Dr. Medina did not need to come into the office anymore and that the midlevel providers would handle everything going forward. (Medina Dec. ¶ 8). Dr. Medina found this comment to be very strange but continued to come to the office. (Medina Dec. ¶ 8). However, Dr. Medina observed that Dr. Culnan came to the office very infrequently and spent most of his time going to meetings. (Medina Dec. ¶ 6). On several occasions, Dr. Culnan did not appear for patient appointments or surgeries, and Dr. Medina was forced to introduce himself to the patient shortly before the procedure, explaining that Dr. Culnan was not there and that he would be covering for Dr. Culnan. (Medina Dec. ¶ 6).

Additionally, in early October there was a potluck luncheon held for the JMS personnel and Merit Health burn unit personnel, which Dr. Medina attended. (Medina Dec. ¶ 7). During that potluck, Dr. Medina was standing near Dr. Culnan and Robert Sutton, who was then the director of the burn service line for Merit. (Medina Dec. ¶ 7). Dr. Medina heard Mr. Sutton make a remark to Dr. Culnan that he had downloaded all of JMS's information onto an external hard drive. (Medina Dec. ¶ 7). Dr. Medina took this comment to mean that Mr. Sutton had downloaded JMS operational information, protocols, and other practice information. (Medina Dec. ¶ 7). Upon

information and belief, based on Mr. Sutton's LinkedIn profile, he is the Chief Nursing Officer for Magnolia Medical Management, a company established by Dr. Culnan on November 2, 2022. (Hassan Dec. ¶ 23; Hassan Dec. Ex. C)

From approximately October 14-17, 2022, Dr. Culnan traveled to Augusta, Georgia to provide call coverage, and he met with Dr. Hassan on October 17, 2022 to discuss the status of the practice in Mississippi. (Hassan Dec. ¶ 20). Dr. Hassan asked Dr. Culnan whether he intended to or wanted to continue working with JMS, and Dr. Culnan replied that he was not able to answer that question. (Hassan Dec. ¶ 20). Upon information and belief, Dr. Culnan returned to Mississippi and proceeded to meet with executives at Hospital on October 18, 2022 to discuss some sort arrangement for himself – either through direct employment with Hospital or partnership with a practice he would create. This meeting was discussed in an e-mail exchange between Kelley Farner and Nelda Thomas. (Smith Dec. Ex. C). Dr. Hassan was not informed of the fact that Dr. Culnan had met with Hospital executives on October 18, 2022. (Hassan Dec. ¶ 17)

Following Dr. Culnan's visit to Augusta, the decision was made to terminate Dr. Culnan's employment. (Hassan Dec. ¶ 21). Pursuant to his Employment Agreement, Dr. Culnan was entitled to a ninety-day notice period prior to his termination becoming effective.

On October 20, 2022, Dr. Culnan came by the JMS Mississippi office and spoke with Dr. Medina. (Medina Dec. ¶ 10). Sometime on October 24, Dr. Culnan called a meeting of some of the midlevel providers at JMS Mississippi. (Medina Dec. ¶ 11). Upon information and belief, Dr. Culnan discussed with the midlevel providers additional information regarding leaving JMS Mississippi and working with him in a new practice. (Medina Dec. ¶ 11-12). Dr. Medina happened to be in the office during this meeting and came into the meeting towards the end. (Medina Dec. ¶ 11). At that time, he overheard one of the midlevel providers asking Dr. Culnan about employee benefits and job security. (Medina Dec. ¶ 12). Dr. Culnan responded with words to the effect that

the midlevel providers would receive all of the same benefits and pay they received from JMS, but their checks would have a different name on them. (Medina Dec. ¶ 12).

On October 25, 2022, Dr. Hassan traveled to Jackson to notify Dr. Culnan of his termination. (Hassan Dec. ¶ 22). Dr. Culnan was instructed to leave the premises and not return to the practice; however, he would continue to be paid his base salary during the ninety-day notice period. (Hassan Dec. ¶ 22). On October 28, 2022, Dr. Culnan sent Dr. Hassan an e-mail resigning from his position with JMS. (Hassan Dec. ¶ 22). Upon information and belief, on or about November 1, 2022, Dr. Culnan incorporated Mississippi Burn, Hand and Reconstruction Centers, PC. ("Mississippi Burn") and he incorporated a medical management company, Magnolia Medical Management Company LLC on or about November 2, 2022. (Hassan Dec. ¶ 23 and Hassan Dec. Exhibit B and C).

While Dr. Culnan did not return to JMS Mississippi's office after he was terminated, his wife Genevieve, who is listed as Mississippi Burn's registered agent with the Mississippi Secretary of State, made several visits back to the office to meet with midlevel providers following Dr. Culnan's resignation. (Medina Dec. ¶ 16 and Hassan Dec. Exhibit B).

Having moved to smaller office space at JMS Mississippi's new location and because the providers were not yet credentialed at new hospitals, the JMS Mississippi midlevels developed an "office hours" program. Upon information and belief, the midlevels would take turns handling clinic hours; when not in the clinic they would work from home researching various topics to create a "burn manual." While working from home, the midlevels were receiving pay from JMS. On November 8, 2022, Mindy Butler sent a Microsoft Teams message to all JMS Mississippi midlevels regarding the "APP Burn Manual." (Smith Dec. Ex. D). Ms. Butler asked all of the midlevels to email their contributions to a Google e-mail address she had created – MSBurnAPP@gmail.com – and gave them instructions on formatting – including directing them

to use "Word or google docs." (Smith Dec. Ex. D). However, the other midlevel providers were not given access to this account.

Upon information and belief, this e-mail address was used by former JMS midlevels to collect existing JMS confidential information and information newly and recently developed— i.e., information developed by the JMS Mississippi midlevels during "office hours"—using JMS time and resources for the benefit of Mississippi Burn. The e-mail address is particularly notable, as "MS Burn" is what Plaintiff understands as shorthand for Mississippi Burn – the shortened name of Dr. Culnan's new practice. "APP" is an abbreviation commonly used in the medical field for "advanced practice provider," a term describing nurse practitioners and physician's assistants. Further, on November 10, 2022, Kelley Farner texted the other JMS midlevels that she had "uploaded all the BRCA protocols" as a "resource." (Hassan Dec. Ex. A). While Ms. Farner describes these as "BRCA protocols," BRCA is often used as shorthand for anything used by the JMS physician practices. "BRCA" is the Burn and Reconstructive Centers of America, JMS's management services organization. Further, even if this would constitute BRCA material, JMS may have joint ownership of this material by virtue of its management relationship with BRCA. It is impossible know without reviewing what was uploaded to this shared drive but given Ms. Farner's willingness to upload this company information, it is likely that other JMS/BRCA information was uploaded as well.

Upon information and belief, some of the JMS Mississippi midlevels also diverted JMS patients to Dr. Culnan's new practice at his behest. On one occasion, on or about November 22, 2022, Dr. Medina was seeing a patient with assistance from midlevel provider Nelda Thomas. (Medina Dec. ¶ 19). After Dr. Medina informed the patient that an elective surgical procedure would need to be performed, Ms. Thomas left the room, purportedly to contact Dr. Marc Walker, a plastic surgeon associated with University of Mississippi Medical Center who used to assist JMS with weekend call. (Medina Dec. ¶ 19). The midlevels had been instructed that, until Dr. Medina

obtained credentialing at a new hospital, they were to refer patients to Dr. Walker. (Smith Dec. Ex. E). After Ms. Thomas did not return, Dr. Medina went to look for her and found her with Kelley Farner; Farner was talking to someone on the phone. (Medina Dec. ¶ 19). Dr. Medina believed Ms. Farner was on the phone with Dr. Walker or his assistant. (Medina Dec. ¶ 19). After Ms. Farner hung up, Dr. Medina asked Ms. Farner for the number she had called. (Medina Dec. ¶ 19). At that time, Dr. Medina learned that Ms. Farner had not been speaking to Dr. Walker, but instead had been speaking to Dr. Culnan's wife and had actually referred the patient to Dr. Culnan. (Medina Dec. ¶ 19). Interestingly, Ms. Thomas failed to mention anything about Dr. Culnan in the patient's progress note and instead wrote that the patient had been encouraged to contact Dr. Walker for non-urgent surgery. (Medina Dec. ¶ 20). Further, neither Dr. Culnan, Ms. Farner nor Ms. Thomas had been involved in this patient's original treatment. (Medina Dec. ¶ 20).

On December 9, 2022, midlevel provider Rachel Ratliff resigned from JMS Mississippi effective immediately. (Hassan Dec. ¶ 26). On December 11, 2022, midlevel provider Kelley Farner resigned from JMS Mississippi with an effective date of December 25, 2022. (Hassan Dec. ¶ 27). On December 12, 2022 midlevel providers Mindy Butler, Nelda Thomas, and Allison Taylor resigned from JMS Mississippi with effective dates of December 22, 2022 for Ms. Butler and December 23, 2022 for the others. (Hassan Dec. ¶ 28). Also on December 12, 2022, John David Smith, a patient liaison with JMS Mississippi, resigned with an effective date of December 16, 2022. (Hassan Dec. ¶ 29). On December 13, 2022, Anya Reid, JMS Mississippi's officer manager, resigned with an effective date of December 27, 2022. (Hassan Dec. ¶ 30). Of these employees, Ms. Taylor, Ms. Farner, Ms. Reid, Mr. Smith, and Ms. Ratliff informed other JMS employees that they would be going to work for Dr. Culnan. (Hassan Dec. ¶ 31). Upon information and belief, the other departing employees are also employed or will be employed by Dr. Culnan.

## II.     CERTIFICATION OF EFFORTS TO GIVE NOTICE PURSUANT TO FED. R. CIV. P. 65(b)1(B)

Pursuant to Fed. R. Civ. P. 65(b)(1)(B), the undersigned counsel hereby certifies that reasonable efforts to give prior notice to Defendants have been made and that further notice should not be required. Counsel for Plaintiffs have: (1) sent a copy of this pleading, all attachments hereto, and all other contemporaneously filed pleadings to the captioned defendants via their counsel in Augusta, Georgia, James Murray; (2) requested personal service through a process server; and (3) attempted to reach the captioned defendants' counsel via telephone.

## III.     ARGUMENT

### A.     Standard for Granting TRO or Preliminary Injunction

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1985). Rather, JMS is entitled to a preliminary injunction if it demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to JMS outweighs whatever damage the proposed injunction may cause the opposing parties; and (4) if issued, the injunction would not be adverse to the public interest. *See, e.g., Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). The same standard applies to motions for TRO. *See, e.g.*, *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995) (citing *Gresham Park Community Org. v. Howell*, 652 F.2d 1227, 1232 n.7 (5th Cir. 1981)).

A TRO may be entered in advance of a full hearing whenever the plaintiff will suffer immediate and irreparable injury or loss before it is possible for the defendant to be heard in opposition to the plaintiff's motion for preliminary injunction. *See* Fed. R. Civ. P. 65; *see also Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995). Likewise, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials

which would not be admissible evidence for a permanent injunction." *Levi Strauss*, 51 F.3d at 985.

A showing of irreparable injury is the "sine qua non" of a request for temporary injunctive relief.

*Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

As demonstrated below, JMS has satisfied the required elements to obtain injunctive relief

to prevent Dr. Culnan and his new entity from soliciting and hiring JMS employees, soliciting JMS

patients, and from misusing JMS's confidential information.

### B.     JMS Has a Substantial Likelihood of Success on the Merits

#### 1.   *This Court has Personal Jurisdiction, and Georgia Law Applies to the Employment Agreement*

In paragraph twenty-one of the Employment Agreement, JMS and Dr. Culnan consented

to personal jurisdiction in, along with related state courts, "any federal…court…located in the

United States District Court for the Southern District of Georgia" and agreed that neither party

would bring any action relating to the Employment Agreement in any court other than a "federal

or state court sitting in Richmond County, Georgia (and appropriate appellate courts therefrom)."

(Culnan Employment Agreement ¶ 21.) The Eleventh Circuit has summarized the law in this

circuit regarding contractual forum selection clauses as follows:

> To begin, the construction of forum selection clauses by federal courts is a matter
> of federal common law, not state law of the state in which the federal court sits. *P
> & S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir.
> 2003) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 28–29, 108 S.Ct. 2239,
> 101 L.Ed.2d 22 (1988)). Under federal common law, forum selection clauses are to
> be interpreted by reference to "ordinary contract principles." *Snapper, Inc. v.
> Redan*, 171 F.3d 1249, 1261 (11th Cir. 1999). Moreover, we have found forum
> selection clauses to be "presumptively valid" and will enforce them absent evidence
> of fraud, overreaching or similar inequitable conduct. *Rucker v. Oasis Legal
> Finance, LLC*, 632 F.3d 1231, 1236 (11th Cir. 2011) (quoting *Krenkel v. Kerzner
> Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009)). Thus, a forum selection
> clause will only "be invalidated when: (1) its formation was induced by fraud or
> overreaching; (2) the plaintiff would be deprived of its day in court because of
> inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of a
> remedy; or (4) enforcement of the clause would contravene public policy." *Slater*,
> 634 F.3d at 1331 (quoting *Krenkel*, 579 F.3d at 1281). The burden is on the party
> resisting the enforcement of a forum selection clause to establish fraud or

> inequitable conduct sufficient to bar enforcement of the clause. *Rucker*, 632 F.3d
> at 1236.

*Cornett v. Carrithers*, 465 F. App'x 841, 842–43 (11th Cir. 2012). Here, the Employment

Agreement was not the product of fraud or inequitable conduct.  Dr. Culnan would bear the burden

of making a contrary showing to defeat the Agreement's forum selection clause. Culnan cannot

make such a showing here, so this Court should enforce the forum selection clause, properly assert

personal jurisdiction over the parties, and confirm that venue is proper in this Court.

In paragraph twenty-four of the Employment Agreement, JMS and Dr. Culnan agreed that

the Employment Agreement "shall be construed and regulated under and by the laws of the State

of Georgia." (Culnan Employment Agreement ¶ 24.) This case is before this Court based on

diversity jurisdiction pursuant to 28 U.S.C. § 1332. (Compl. ¶ 10.) When exercising diversity

jurisdiction, this Court must "apply the choice of law rules of the forum state to determine which

substantive law governs the action." *U.S. Fidelity Guar. Co. v. Liberty Surplus Ins. Corp.*, 550

F.3d 1031, 1033 (2008). "Pursuant to Georgia law, contractual choice-of-law provisions 'will be

enforced unless application of the chosen law would be contrary to public policy or prejudicial to

the interest of this state." *Natl' Freight, Inc. v. Consol. Container Co., LP*, 166 F. Supp. 3d 1320,

1326 n.3 (N.D. Ga. 2015) (*citing CS-Lakeview at Gwinnet, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga.

426, 428 (2008). The issues in this case involve the enforceability of certain provisions of the

Employment Agreement pursuant to the Georgia's Restrictive Covenants Act ("GRCA"),

O.C.G.A. § 13-8-50, *et seq.* The GRCA contains the findings of the Georgia General Assembly

that "reasonable restrictive covenants contained in employment and commercial contracts serve

the legitimate purpose of protecting legitimate business interests and creating an environment that

is favorable to attracting commercial enterprises to Georgia and keeping existing business within

the state." O.C.G.A. § 13-8-50. Thus, it can hardly be said that applying the GRCA to this case

would either be against Georgia public policy or prejudicial to the interest of the state. Accordingly, this Court should apply Georgia law and the GRCA to the Employment Agreement.

>   2. *The restrictive covenants contained in the Employment Agreement are enforceable under the GRCA.*

The restrictive covenants at issue in this case comply with the GRCA and are enforceable. The restrictive covenant addressing Dr. Culnan's use of and access to confidential information is reasonable and directly related to protecting the business interests of JMS. In that "confidentiality" covenant, Dr. Culnan agreed that "[e]xcept to the extent necessary to perform the duties assigned to him by the Company and to fulfill his obligations to patients" he would hold all confidential information in "trust and strictest confidence" and would not "use, reproduce, distribute, disclose, or otherwise disseminate" the confidential information. (Culnan Employment Agreement ¶ 16(a).) Dr. Culnan recognized in the Employment Agreement the "interest of [JMS] and its affiliates in maintaining the confidential nature" of its confidential information. (*Id.*) Dr. Culnan further agreed "not to misuse" any confidential information "to the detriment of" JMS. (Culnan Employment Agreement ¶ 16(b).)

Although much of the case law pertaining to the protection of confidential information predates the GRCA, Georgia courts have typically found that the "validity of a non-disclosure provision depends upon its reasonableness, which, in turn, hinges on two factors: (1) whether the employer is attempting to protect confidential information relating to the business, such as trade secrets, methods of operation, names of customers, personnel data, and so on; and (2) whether the restraint is reasonably related to the protection of the information." *Physician Specialists in Anesthesia, P.C. v. MacNeill*, 246 Ga. App. 398, 407-408 (2000). The GRCA does not limit the time period "for which a party may agree to maintain information as confidential" nor does it "limit the geographic area within which such information must be kept confidential…for so long as the information…remains confidential." O.C.G.A. §13-8-53.

Here, the definition of confidential information in the employment agreement includes "highly confidential" information and may include "trade secrets," including but not limited to:

> information regarding patient lists, patient solicitation, patient treatment and charging, billing practices and procedures, business techniques and methods, strategic plans, financial statements and reports, operating manuals, leases, employment agreements, and any and all reports, memoranda or correspondence and related data regarding the Company's methods of operation, symbols, trademarks, service marks, designs, management information systems, utilization procedures and protocols, forms and claims processing techniques, utilization review and quality assurance mechanisms and data, agreements with managed care organizations and purchasers of services, educational programs related to Company activities, any information related to Company's financial affairs, business and marketing plans and strategies, contract negotiations with managed care organizations, Company fee schedules, and any other information that Company considers to be a trade secret or confidential information

(Culnan Employment Agreement ¶ 16(a).) The items in the foregoing list are all types of information relating to the business of running a medical practice and constitute precisely the types of information one would reasonably expect a business to keep private – indeed, some of the information listed, such as patient lists and patient treatment and charging, would be protected from unauthorized disclosure by federal privacy laws. The restrictions imposed on Dr. Culnan not to misuse the listed information are reasonably related to the protection of JMS' confidential business information. Therefore, this restrictive covenant is enforceable under the GRCA.

The restrictive covenant prohibiting Dr. Culnan from soliciting, directly or indirectly, patients that he had treated within twelve months prior to his termination is also enforceable. The GRCA provides that:

> an employee may agree in writing for the benefit of an employer to refrain, for a state period of time following termination, from soliciting or attempting to solicit, directly or by assisting others, any business from any of such employer's customers…with whom the employee had material contact during his or her employment for purposes of providing services that are competitive with those provided by the employer's business.

O.C.G.A. § 13-8-53(b). Further, "[n]o express reference to geographic services or the types of products or services considered to be competitive shall be required in order for the restraint to be enforceable." Id.

Under his Employment Agreement, Dr. Culnan was prohibited from directly or indirectly soliciting or attempting to solicit patients he treated within the twelve months prior to his termination. This statement satisfies the requirement of the GRCA that any customer non-solicitation provision be limited to patients with whom Dr. Culnan had material contact. Further, the duration of the customer non-solicitation clause—the 2-year period following Dr. Culnan's termination, is presumptively reasonable. Under the GRCA, "any restraint two years or less in duration" is presumed to be reasonable. O.C.G.A. § 13-8-57(b). Therefore, the customer non-solicitation provision in the Employment Agreement is enforceable.

The restrictive covenant prohibiting Dr. Culnan from soliciting or attempting to hire JMS employees during the course of his employment is likewise enforceable under the GCRA. Although the GCRA does not specifically address employee non-solicitation provisions, Georgia courts have found that the general provisions of the GCRA are applicable to these types of restrictive covenants. *Belt Power, LLC v. Reed*, 354 Ga. App. 289, 293-294 (2020). Under the GCRA, a restrictive covenant that applies during the term of an employment relationship "shall not be considered unreasonable because it lacks any specific limitation upon scope of activity, duration, or geographic area so long as it promotes or protects the purpose or subject matter of the agreement or relationship or deters any potential conflict of interest." O.C.G.A. § 13-8-56(4).

Here, the in-term employee non-solicitation agreement both furthers the purpose of the agreement and deters potential conflicts of interest. JMS has spent considerable time and resources training its employees in its specialized practice of burn medicine, and therefore it has an interest in protecting that investment from a party that has access to those employees and would seek to hire them away to start a competing business—just as Dr. Culnan did in this case. Further, the

restrictive covenant helps deter conflicts of interest that could arise where a party, such as Dr. Culnan, may influence employees, such as Kelley Farner, to take actions that are not in the best interest of the practice or the patient because the employees are being solicited to leave their employment. Therefore, the employee non-solicitation agreement during the term of Dr. Culnan's employment is enforceable.

Finally, the prohibition against Dr. Culnan soliciting or attempting to hire away JMS employees for two years after the termination of his employment with JMS is enforceable. In this regard, the covenant's provision that "upon termination" Culnan may not "directly or indirectly solicit or attempt to hire away any persons then employed or retained by the Company, for a period of two (2) years" (Employment Agreement ¶ 27(c)), is a good faith estimate of the extent of the employee non-solicitation restriction permitted by O.C.G.A. § 13-8-53(c)(1). The covenant prohibits Culnan from soliciting or hiring away individuals that were JMS employees at the time of Culnan's termination for the presumptively reasonable period of two years. "Georgia Courts have found restrictions reasonable when they generally prohibit soliciting employees to leave the employment of the plaintiff-employer." *S. Felt Co., Inc. v. Konesky*, 2020 WL 5199269, at *8 (S.D. Ga. 2020). It follows that this post-employment covenant is also enforceable.

### 3. Dr. Culnan violated his restrictive covenants both during and after the term of his employment.

There is sufficient evidence for the Court to find that Dr. Culnan has violated his restrictive covenants both during and after the term of his employment. The October 10, 2022 e-mail from Kelley Farner to the other JMS Mississippi midlevels is *prima facie* evidence that Dr. Culnan solicited the JMS Mississippi midlevels, either directly or indirectly 1) to join him in employment with Hospital or in a new practice; and 2) to provide him with confidential information – i.e. salary information – which he intended to misuse either in negotiations with Hospital or in forming his own practice. That e-mail, coupled with Dr. Culnan's meeting with the JMS Mississippi midlevels

immediately before his termination – which Dr. Medina observed and in which he overheard Dr. Culnan tell a midlevel, in essence, that the midlevel's pay and benefits would remain the same when leaving JMS for a competing entity – provide strong evidence that Dr. Culnan solicited JMS Mississippi employees during the term of his employment.

Additionally, the fact that the JMS midlevels who left JMS to work with Mississippi Burn were e-mailing JMS information and/or information created using JMS time and resources to an e-mail address entitled MSBurnAPP@gmail.com provides strong evidence that Dr. Culnan, either directly or indirectly, is misappropriating JMS confidential information and misusing it to benefit his own practice. Finally, the fact that JMS Mississippi midlevels were diverting patients to Dr. Culnan, without direction to do so from the supervising physician at JMS Mississippi, provides sufficient evidence to conclude that Dr. Culnan was soliciting patients indirectly through the midlevels he intended to hire away from JMS and also misappropriating JMS's confidential information related to its patients. JMS developed the foregoing information without the benefit of discovery, but anticipates that discovery will yield additional evidence that Dr. Culnan has breached the restrictive covenants of his Employment Agreement and potentially violated federal laws with respect to patient information and/or JMS trade secrets.

### C.    JMS Will Suffer Irreparable Harm if Defendants are Not Enjoined From Continuing to Benefit from Their Breaches of the Restrictive Covenants

JMS will also suffer immediate and irreparable harm unless it is granted temporary injunctive relief. JMS was at a particularly vulnerable point when Merit, through no fault of JMS, elected to terminate its affiliation with JMS and end its burn program. JMS was in the process of negotiating new arrangements with other hospitals and was relying on Dr. Culnan, as its senior physician at JMS Mississippi, to actively participate in this process. Instead of complying with his Employment Agreement—including its restrictive covenants and its mandate that he "devote his entire time, attention, and energies to the business of the Company" (Employment Agreement, ¶

5(a)), Dr. Culnan exploited JMS's vulnerability by convincing the majority of JMS's Mississippi employees to leave JMS and establish a competing practice. To boot, Dr. Culnan took meetings with other hospitals and health systems behind JMS's back, seeking to usurp JMS corporate opportunities for himself *while he was still employed by JMS*. (*See, e.g.*, Hassan Dec. ¶ 17.) Dr. Culnan compounded this backstabbing by convincing JMS Mississippi midlevels to assist him in misappropriating JMS confidential information and patients.

The harm to JMS from Dr. Culnan's actions cannot be overstated. They pose an existential threat to JMS operations in Mississippi and put at risk more than a decade of effort and money invested into JMS's presence in Mississippi. JMS has learned that even in the last few days, Dr. Culnan and Mississippi Burn are undertaking a marketing campaign to try to portray Mississippi Burn as the successor to JMS in Mississippi. (Medina Dec. 24).

The effects of Dr. Culnan's efforts have been immediately noticeable. JMS formerly received referrals for burn patients in Mississippi through their centralized phone line; however, those calls have dropped substantially in the last few weeks. (Hassan Dec. ¶ 32). Dr. Culnan's efforts have also undermined JMS's ability to negotiate a new arrangement with Hospital,[3] since Dr. Culnan has stolen a significant portion of JMS's workforce in Mississippi.

Notably Dr. Culnan's Employment Agreement does not prevent him from competing against JMS by performing burn surgeries. Dr. Culnan was free to become a hospital-employed surgeon or to start his own practice and compete fairly with JMS. What he was not permitted to do was to steal employees, patients, and confidential information JMS had spent years and substantial resources developing just to get a "leg up" on JMS and compete unfairly with the goal

---

[3] Thus, Dr. Culnan's actions also constitute a breach of ¶ 27(d) of his Employment Agreement, which provides that Dr. Culnan may not "directly or indirectly interfere with any contractual relationship between the Company and any medical facility or institution or payor at which or for which Employee has performed services under this Agreement…"

of driving JMS Mississippi out of business. If the Court does not enjoin Dr. Culnan from benefitting from his ill-gotten gains, that will be the likely result.

      **D.**      **The Threatened Injury to JMS Far Outweighs Any Harm JMS's Proposed TRO and Preliminary Injunction May Cause Defendants.**

Allowing Dr. Culnan and Mississippi Burn to continue to employ JMS's former employees and misuse its confidential information would give Defendants an unfair and unearned advantage, and likely lead to the end of JMS Mississippi. As a result, the balance of the harms strongly favors JMS. This is particularly true since Dr. Culnan's Employment Agreement allows him to earn a living as a surgeon, and even start his own practice, right there in Jackson, Mississippi while competing directly with JMS; he simply cannot pilfer JMS's resources to do so. If Defendants are allowed to unfairly compete against JMS by benefitting from Dr. Culnan's violations of his Employment Agreement, JMS Mississippi will likely cease to exist. Dr. Culnan on the other hand "'cannot suffer compensable harm when enjoined from an unlawful activity" and, as previously stated, he is still free to continue practicing medicine in direct competition with JMS right there in Jackson, Mississippi if he so chooses. *Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc.*, 793 F. Supp. 2d 1302, 1314 (N.D. Ga. 2011) (quoting *Specialty Chems. & Servs., Inc. v. Chandler*, No. Civ. 1:87-cv-2338-MHS, 1988 U.S. Dist. LEXIS 16090, 1988 WL 618583, at *4 (N.D. Ga. Sept. 26, 1988)); *see also MediaOne of Delaware, Inc. v. E & A Beepers and Cellulars*, 43 F. Supp. 2d 1348, 1354 (S.D. Fla. 1998).

There is no cognizable harm to Dr. Culnan in requiring him to build a practice for himself rather than being permitted to steal the fruits of JMS's labor. JMS expended its resources in recruiting and training employees, developing and maintaining a patient base, and establishing a referral network; it merely seeks to prevent Dr. Culnan from converting its hard work into Dr. Culnan's gain and JMS's potential ruin.

The respective harms to JMS and the lack of true harm to Defendants demonstrate the need for immediate injunctive relief. Indeed, Dr. Culnan acknowledged the irreparable harm that would come to JMS if he violated the restrictive covenants in the Employment Agreement. (Culnan Employment Agreement ¶ 28.) Further, Dr. Culnan agreed that if he violated any of his restrictive covenants, which he has, JMS would be entitled to a temporary or permanent restraining order or injunction in order to enforce its rights, without the necessity of posting bond. (*Id.*)  Defendants will suffer no harm if they are restrained—temporarily—and required to (a) not employ or cease to employ former JMS employees who were improperly solicited by Dr. Culnan; (b) cease soliciting patients, directly or indirectly, whom Dr. Culnan treated during the twelve (12) months prior to the end of his employment with JMS; (c) return to JMS any and all JMS confidential information in his possession and cease to use it in his practice;  (d) present for forensic inspection all of Defendants' and Defendants' employees electronic devices so that JMS can confirm the extent of Defendants' theft of JMS's trade secrets; and (e) refrain from disclosing or using any JMS confidential information acquired, directly or indirectly, immediately. Simply put, a temporary restraining order will do nothing more than preserve the status quo, which is precisely its purpose. Further, Dr. Culnan is free to continue to practice medicine during the pendency of this case.

### E.  The Public Interest Favors Enjoining Defendants.

Georgia public policy strongly favors protecting employer's confidential information. *See, e.g.*, *Wesley-Jessen, Inc. v. Armento*, 519 F. Supp. 1352, 1361 (N.D. Ga. 1981). More generally, there is also a strong public policy in favor of promoting *fair* competition. *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1243 (11th Cir. 2005); *Salsbury Labs, Inc. v. Merieux Labs, Inc.*, 735 F. Supp. 1537, 1544 (M.D. Ga. 1987) ("[P]ublic interest favoring competition 'does not mean that defendants are entitled to free access to plaintiff's trade secrets nor does this mean that defendants may compete unfairly.'"). Granting an injunction will protect JMS's significant investment in

developing a burn practice in Mississippi and will ensure that any competition in the future between JMS and Mississippi Burn is fair and based on each respective organization's ability to provide a high level of care to burn victims and not on one party unfairly exploiting the other's vulnerability and unfairly competing.

## IV.    CONCLUSION

For the foregoing reasons, JMS respectfully requests the Court to immediately enter a Temporary Restraining Order and Preliminary Injunction:

A.    For a period of two years, restraining and enjoining Dr. Culnan and his entities, Mississippi Burn, Hand, and Reconstruction, PC and Magnolia Medical Management LLC, from employing or continuing to employ any employees of JMS that were employed by JMS at the time of Dr. Culnan's departure;

B.    For a period of two years, soliciting any JMS patients whom Dr. Culnan treated during the twelve (12) months prior to the termination from JMS;

C.    Ordering Defendants to preserve and return any JMS confidential information in their possession;

D.    Ordering a forensic examination of all electronic devices and media in the possession, custody, or control of Defendants and its employees who are former employees of JMS, including, without limitation, computers, tablets, external hard drives, other external media and storage devices, smart phones, and e-mail accounts, including without limitation MSBurnAPP@gmail.com; and

E.    Ordering any other relief this Court deems just and reasonable.

Respectfully submitted, this 9th day of January, 2023.

_/s/ Samuel J. Adams_
SAMUEL J. ADAMS
Georgia Bar No. 397520
KYLE WADDELL
Georgia Bar No. 676825
FULCHER HAGLER LLP
Post Office Box 1477
Augusta, GA 30903-1477
(706) 724-0171
sadams@fulcherlaw.com
kwaddell@fulcherlaw.com
_Attorneys for Plaintiffs_

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served all parties in this case in accordance with the notice of electronic filing ("NEF") which was generated as a result of electronic filing in this Court.

This is to further certify that I have on this day served on counsel of record by United States Mail, postage prepaid, addressed to the following counsel of record:

James S. Murray
Turner Padgett
209 Seventh Street
Third Floor
Augusta, GA 30901

This 9th day of January, 2023.

/s/ Samuel J. Adams
SAMUEL J. ADAMS
Georgia Bar No. 397520
KYLE WADDELL
Georgia Bar No. 676825
FULCHER HAGLER LLP
Post Office Box 1477
Augusta, GA 30903-1477
(706) 724-0171
sadams@fulcherlaw.com
kwaddell@fulcherlaw.com
Attorneys for Plaintiffs